IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Davon Young (M-52768), ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 17 C 50018 |
| v. ) | |
| ) | Judge Frederick J. Kapala |
| ) | |
| Scott Nailor, et al., ) | |
| ) | |
| Defendants. ) | |

**ORDER**

    Plaintiff's second application for leave to proceed *in forma pauperis* [8] is granted. The Court orders the trust fund officer at Plaintiff's place of incarceration to deduct $51.73 from Plaintiff's account for payment to the Clerk of Court as an initial partial payment of the filing fee, and to continue making monthly deductions in accordance with this order. The Clerk of Court shall send a copy of this order to the trust fund officer at the Dixon Correctional Center. The Court further directs the Clerk of Court to: (1) file Plaintiff's complaint [1]; (2) issue summonses for service on Defendants Warden Donald Enloe and C/O Scott Nailor by the U.S. Marshal; and (4) send Plaintiff two blank USM-285 service forms, a magistrate judge consent form, filing instructions, and a copy of this order. Plaintiff's motion for service of process at government expense [4] is granted, pending Plaintiff's compliance with this order. The Court advises Plaintiff that a completed USM-285 form is required for service on each Defendant (Enloe and Nailor). The U.S. Marshal will not attempt service on a Defendant unless and until the required form for that Defendant is received. The U.S. Marshal is appointed to serve Defendants Enloe and Nailor. Plaintiff's motion for attorney representation [5] is denied without prejudice to later renewal.

**STATEMENT**

    Plaintiff Davon Young, an Illinois prisoner housed at Dixon Correctional Center, brought this *pro se* civil rights action, invoking 42 U.S.C. §§ 1981 and 1983, claiming that prison officials have discriminated against her for her transgender status and retaliated against her for submitting a grievance and Prison Rape Elimination Act ("PREA") report about the incident. Plaintiff alleges that she is a transgender inmate. (Dkt. 1, pg. 6, 10, 1.) On February 23, 2016, as she and two other (apparently transgender) inmates entered a building "for prayer room," they passed Correctional Officer Scott Nailor, who was stationed at a desk speaking on the telephone. (*Id*. at 6.) They turned to Nailor after hearing him direct "fags" to "push the fuck on." (*Id*.) While other inmates and staff members looked on, Nailor said he is "sick of you fucking sissies" and "went further by calling us bitches, queers, princess queens." (*Id*. at 6.) Nailor then told one

of the other inmates with Plaintiff to "go fucking cry and write a grievance bitch". (*Id.*) Plaintiff then entered the prayer room, where Correctional Officer Meadow told Plaintiff that Nailor's comments were "uncalled for" and contacted Lieutenant Newman with Internal Affairs. (*Id.*) Newman interviewed Plaintiff. (*Id.,* pg. 7.) Nailor then, however, wrote a disciplinary ticket against Plaintiff for "sexual misconduct and insolence," accusing Plaintiff of "flirting with him." (*Id.*) Plaintiff believes Nailor's comments also may have been race-related, as she has not heard of him subjecting white transgender inmates to similar treatment. (*Id.*, pg. 10-11.)

Plaintiff submitted a grievance and "PREA report" regarding Nailor's behavior. (*Id.*, pg. 13.) Plaintiff heard that Nailor was given 15 days off for his actions. (*Id.,* pg. 3.) The disciplinary ticket against Plaintiff was dismissed. (*Id*. at 13.)

Following the incident, Plaintiff was segregated in "Housing Unit 31" under less desirable circumstances than her prior cell placement. (*Id*. at 7, 13.) Her cell there was an "in-take" cell with tighter restrictions on the use of phones, washers, showers, and the day room as compared to general population inmates. (*Id.*) And, instead of sharing a cell with only one other inmate, Plaintiff was housed with three other inmates, who were uncomfortable being housed with a transgender inmate. (*Id.*) Plaintiff believes that she was reassigned as retaliation for her complaint against Nailor. (*Id.,* pg. 14.) Plaintiff does not believe there was a valid "peneological interest in security" to reassign her because unlike a typical PREA report that is made against another inmate, Plaintiff's complaint was instead made against a correctional officer. (*Id.*) Former Warden Enloe was made aware of the situation but failed to address it. (*Id.,* pg. 13.) Plaintiff encountered Nailor again on November 18, 2016, when, as Plaintiff was entering the school building, she heard Nailor say "that's one of the fags right there". (*Id.,* pg. 14, 16.) Plaintiff did not report this incident for fear of being put back in "building 31". (*Id.,* pg. 14.)

Since the incident in February 2016, Plaintiff has been fearful, unable to sleep, and has been experiencing nightmares and bed wetting. (*Id.,* pg. 7.) She has started seeing a psychologist. (*Id.,* pg. 12.) Her day-to-day activities are also restricted because she chooses to mostly stay in her cell out of fear of encountering Nailor. (*Id.,* pg. 7, 11.)

Plaintiff invokes 42 U.S.C. §§ 1981 and 1983, alleging that her rights to equal protection and to be free from unlawful discrimination and retaliation were violated. She also raises intentional infliction of emotional distress under Illinois law. She seeks compensatory, nominal and punitive damages, as well as injunctive relief "to stop harassing treatment" and "to train staff with dealing with transgenders." (*Id*. at 8.)

Currently before the Court are Plaintiff's second application for leave to proceed *in forma pauperis*, her complaint for initial review under 28 U.S.C. § 1915A, her motion for attorney representation, and her motion for service of process at government expense.

Plaintiff's application for leave to proceed *in forma pauperis* demonstrates she cannot prepay the filing fee and is thus granted. Pursuant to 28 U.S.C. § 1915(b)(1), (2), the Court orders: (1) Plaintiff to immediately pay (and the facility having custody of him to automatically remit) $51.73 to the Clerk of Court for payment of the initial partial filing fee and (2) Plaintiff to

pay (and the facility having custody of her to automatically remit) to the Clerk of Court twenty percent of the money she receives for each calendar month during which she receives $10.00 or more, until the $350 filing fee is paid in full. The Court directs the Clerk of Court to ensure that a copy of this order is mailed to each facility where Plaintiff is housed until the filing fee has been paid in full. All payments shall be sent to the Clerk of Court, United States District Court, 219 South Dearborn Street, Chicago, Illinois 60604, attn: Cashier's Desk, 20th Floor, and shall clearly identify Plaintiff's name and the case number assigned to this case.

Under 28 U.S.C. §§ 1915(e)(2) and 1915A(a), the Court is required to screen *pro se* prisoners' complaints, including amendments, and dismiss the complaint, or any claims therein, if the Court determines that the complaint or claim is frivolous or malicious, fails to state a claim on which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief. *See Jones v. Bock,* 549 U.S. 199, 214 (2007); *Turley v. Rednour*, 729 F.3d 645, 649 (7th Cir. 2013).

Courts screen prisoner litigation claims in the same manner as ordinary Federal Rule of Civil Procedure 12(b)(6) motions to dismiss. *See Maddox v. Love*, 655 F.3d 709, 718 (7th Cir. 2011). A motion under Rule 12(b)(6) challenges the sufficiency of the complaint. *See Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The short and plain statement under Rule 8(a)(2) must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (citation omitted). Under the federal notice pleading standards, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id*. Put differently, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570).

"In reviewing the sufficiency of a complaint under the plausibility standard, [courts] accept the well-pleaded facts in the complaint as true." *Alam v. Miller Brewing Co.,* 709 F.3d 662, 665-66 (7th Cir. 2013). Courts also construe *pro se* complaints liberally. *See Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (per curiam).

Plaintiff's allegations implicate the Constitution under the First, Eighth, and Fourteenth Amendments, and she may proceed under § 1983. While mere sexually or gender-charged statements may alone be insufficient to violate the Constitution, *see Beal v. Foster*, 803 F.3d 356, 358 (7th Cir. 2015) (discussing *DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000)); *see also DeWalt*, 224 F.3d at 612 (finding that plaintiff's allegations of supervisor's "racially derogatory and sexually explicit language" were "properly dismissed" because, "[s]tanding alone, simple verbal harassment does not constitute cruel and unusual punishment, deprive a prisoner of a protected liberty interest or deny a prisoner equal protection of the laws") (citations omitted); *Scruggs v. Miller*, No. 3:16-CV-050 JD, 2016 WL 495603, at *3 (Feb. 8, 2016) (holding that racially derogatory terms not likely to risk future harm to plaintiff did not state claim), name-calling that may subject the target inmate to harm, including sexual assault, from others, may implicate the Constitution. *See Beal*, 803 F.3d at 357-58; *Dobbey v. Ill. Dep't of Corr.*, 574 F.3d

443, 445 (7th Cir. 2009); *Benefield v. McDowall*, 241 F.3d 1267, 1271 (10th Cir. 2001). Nailor's alleged comments, made in front of staff and inmates, arguably fall within the second class and implicate the Constitution both in this way and as a potential violation of Plaintiff's equal protection rights. *See Mitchell v. Price*, No. 11-CV-260-WMC, 2014 WL 6982280, at *8-13 (W.D. Wis. Dec. 10, 2014) (addressing inmate's claims that she was subject to adverse treatment due to her transgender status); *see also Kohn v. Ernst*, No. 2:16-CV-115, 2016 WL 5349076, at *15 (W.D. Mich. Sept. 26, 2016) (holding that alleged placement of plaintiff in segregation solely due to sexual orientation stated "nonfrivolous" equal protection claim). Plaintiff may proceed against Nailor on these claims.

Next, an inmate may demonstrate retaliation through proof that: "(1) [s]he engaged in activity protected by the First Amendment; (2) [s]he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was 'at least a motivating factor' in the Defendants' decision to take the retaliatory action." *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (citing *Woodruff v. Mason,* 542 F.3d 545, 551 (7th Cir.2008) (quoting *Massey v. Johnson,* 457 F.3d 711, 716 (7th Cir.2006))). It is a close call, but Plaintiff's allegations regarding her placement in Housing Unit 31 under circumstances affecting her security and privacy might, given the timing, suggest retaliatory action by some prison official (although Plaintiff has not identified the person responsible for this alleged retaliation). It is alternatively plausible on the facts alleged that Plaintiff's transfer was for her safety. Although the timing ultimately may be insufficient for Plaintiff ultimately to prove retaliation, *Williams v. Snyder*, 367 F. App'x 679, 682 (7th Cir. 2010) ("But in the prison context, suspicious timing is not enough to overcome uncontradicted evidence of other, non-retaliatory motives."), "at this stage it does not appear 'beyond doubt' that [plaintiff] (whose *pro se* pleadings deserve liberal construction) can prove no set of facts consistent with [her] complaint that would entitle [her] to relief." *Wynn v. Southward*, 251 F.3d 588, 594 (7th Cir. 2001). Plaintiff's allegations also suggest that the responsible prison officials may have been aware of an unreasonably heightened risk to Plaintiff's safety due to the transfer. *See Manning v. Griffin*, No. 15-CV-3 (KMK), 2016 WL 1274588, at *7 (S.D.N.Y. Mar. 31, 2016) (listing cases regarding heightened risk to transgender inmates in prison setting).

Accordingly, Plaintiff may proceed, for now, on a retaliation claim against an as-yet unidentified person or persons, but, to proceed, she must collect evidence regarding the reasons for her transfer and who was responsible for it. She must ultimately name the responsible prison official(s) in an amended complaint that includes factual allegations regarding his or her conduct related to the transfer and ensure that he or she is served with process. Plaintiff may pursue limited discovery on this issue. When counsel for Defendants appears in this case, Plaintiff may send counsel interrogatories (a written list of questions) seeking information regarding the reasons for her transfer and the person(s) responsible. Once she has collected the necessary information, she may seek leave to amend her complaint to add Defendants and allegations on that issue. Plaintiff should do so as soon as possible.

Plaintiff may also proceed as to Defendant Enloe, the previous warden of Dixon, who allegedly was aware of and failed to remedy the danger to Plaintiff through her transfer to Housing Unit 31. *See Perez v. Fenoglio*, 792 F.3d 768, 781-82 (7th Cir. 2015) ("An inmate's correspondence to a prison administrator may [] establish a basis for personal liability under §

4

1983 where that correspondence provides sufficient knowledge of a constitutional violation."); *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996) (holding that "inmate's letters to prison administrators may establish a basis for § 1983 liability" if its "content and manner of transmission, gave the prison official sufficient notice to alert him or her to 'an excessive risk to inmate health or safety.'") (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). And, although this hinges on Plaintiff's ability to show that her transfer was retaliatory, she may, for now, for the same reasons proceed as to Warden Enloe for his failure to remedy the allegedly retaliatory transfer.

Plaintiff may also proceed at this point on a claim of intentional infliction of emotional distress (IIED) as to Defendant Nailor. Under Illinois law, the tort of IIED reaches acts that are truly "outrageous," that is, an "unwarranted intrusion . . . calculated to cause severe emotional distress to a person of ordinary sensibilities." *Knierem v. Izzo*, 174 N.E.2d 157, 164 (Ill. 1961) (citation and quotation marks omitted). IIED has three elements: (1) the conduct must be truly extreme and outrageous; (2) that action must either intend that his conduct inflict severe emotional distress or at least know that there is a high probability that his conduct will cause such severe emotional distress; and (3) the conduct must in fact cause severe emotional distress. *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988). To meet the standard for IIED, the defendant's conduct "must go beyond all bounds of decency and be considered intolerable in a civilized community," *Honaker v. Smith*, 256 F.3d 477, 490 (7th Cir. 2001) (citations omitted), and cause "distress . . . so severe that no reasonable man could be expected to endure it." *McGrath*, 533 N.E.2d at 809. Plaintiff has sufficiently alleged intentional infliction of emotional distress as to Nailor's actions of allegedly yelling dangerous insults to her in a public place and then writing her a false disciplinary ticket to cover his own misconduct.

Accordingly, Plaintiff may proceed on the claims set forth above. Nothing in this order, which is based on preliminary review of the complaint, precludes any legal argument that Defendants may advance in response to Plaintiff's allegations.

The Court perceives only two remaining claims (racial discrimination and any claim under 42 U.S.C. § 1981), and these will be dismissed without prejudice. First, Plaintiff has not provided facts (other than that her race and that of the others she walked with on the day of the incident differs from Nailor's) that Nailor's conduct was racially motivated. Her bare suspicion that Nailor targeted her not only because of her transgender status but also because of race, is insufficient, even at this early stage, to state a claim. Nothing in Nailor's statements suggests that race was a component, and mere labels, conclusions, and "naked assertions devoid of further factual enhancement" are insufficient to state a claim. *Ashcroft*, 556 U.S. at 678 (internal quotation marks and citations omitted). Second, because "42 U.S.C. § 1981 does not create a private right of action against state actors," *Campbell v. Forest Pres. Dist. of Cook Cty., Ill.*, 752 F.3d 665, 671 (7th Cir. 2014), any such claim is dismissed.

The Court directs the Clerk of Court to issue summonses for service of the complaint on Defendants. The Clerk of Court is directed to mail Plaintiff two blank USM-285 (U.S. Marshals service) form. The Court advises Plaintiff that a completed USM-285 form is required for each named Defendant. The U.S. Marshal will not attempt service on a Defendant unless and until the

5

required form for that Defendant is received. Plaintiff must therefore complete and return a service form for each remaining Defendant (Nailor and Enloe), and failure to do so may result in the dismissal of any unserved Defendant, as well as dismissal of this case for lack of prosecution.

The U.S. Marshals Service is appointed to serve Defendants Nailor and Enloe. The Court directs the U.S. Marshal to make all reasonable efforts to serve Defendants. The U.S. Marshal is authorized to send a request for waiver of service to Defendants in the manner prescribed by Federal Rule of Civil Procedure 4(d) before attempting personal service.

Plaintiff is instructed to file all future papers concerning this action with the Clerk of this Court in care of the Prisoner Correspondent. Any letters or other documents sent directly to a judge or that otherwise fail to comply with these instructions may be disregarded by the Court or returned to Plaintiff.

Plaintiff's motion seeking attorney representation is denied at this time. Although "[t]here is no right to court-appointed counsel in federal civil litigation," *Olson v. Morgan*, 750 F.3d 708, 711 (7th Cir. 2014), the Court has discretion to request that an attorney represent an indigent litigant on a volunteer basis under 28 U.S.C. § 1915(e)(1). In making the decision whether to recruit counsel, the Court must engage in a two-step analysis: (1) has the plaintiff made a reasonable attempt to obtain counsel on his own behalf or been effectively precluded from doing so; and, if so, (2) given the factual and legal complexity of the case, does this particular plaintiff appear competent to litigate the matter herself. *Pruitt v. Mote*, 503 F.3d 647, 654-55 (7th Cir. 2007) (en banc). This analysis does not focus solely on the plaintiff's ability to try the case, but on her ability to gather evidence and prepare and respond to motions. *Navejar v. Iyiola*, 718 F.3d 692, 696 (7th Cir. 2013).

Factors to be considered include: (1) the stage of litigation, *Romanelli v. Suliene*, 615 F.3d 847, 852 (7th Cir. 2010) (holding that it is difficult to make an accurate determination regarding a plaintiff's ability to litigate the matter when case is still in "its infancy"); (2) plaintiff's submissions and pleadings, *Olson*, 750 F.3d at 712 (well-written pleadings and appearance that plaintiff can follow instructions indicate that counsel is not needed); (3) medical and mental health issues, *Olson*, 750 F.3d at 712; (4) transfer to a different facility, *Junior v. Anderson*, 724 F.3d 812, 815 (7th Cir. 2013) (transfer to a different facility may impede plaintiff's ability to obtain evidence including affidavits/declarations from others to support his/her claim); (5) plaintiff's capabilities, including intelligence (IQ), literacy, degree of education, communication skills, and litigation experience, *Pruitt*, 503 F.3d at 655; *Dewitt v. Corizon, Inc.*, 760 F.3d 654, 658 (7th Cir. 2014) (recruitment of counsel required for a blind inmate with a tenth-grade education); *Henderson v. Ghosh*, 755 F.3d 559, 565 (7th Cir. 2014) (enlistment of counsel was necessary for a functionally illiterate inmate); and (6) complexity of the case, *Dewitt*, 760 F.3d at 658; *Henderson*, 755 F.3d at 566; *Santiago v. Walls*, 599 F.3d 749, 761 (7th Cir. 2010); *Pruitt*, 503F.3d at 655-56.

After considering the above factors, the Court concludes that solicitation of counsel for Plaintiff is not currently warranted. First, Plaintiff's three letters to prospective counsel are arguably insufficient to demonstrate a reasonable attempt to retain counsel on her own prior to

6

seeking the Court's assistance.  Plaintiff should continue to write to lawyers or law firms, explain her claims, and ask them to represent her pro bono (free of charge) as to this lawsuit.  Second, given the early stage of this case, it is difficult to assess Plaintiff's ability to litigate this case going forward, *see Romanelli*, 615 F.3d at 852, although Plaintiff's submissions to date suggest that she should be able to complete the required next steps to proceed—i.e., to complete and return the required service forms for the remaining Defendants.  Plaintiff, who states that she is a college graduate, has already demonstrated her ability to comprehend and respond appropriately to Court orders and remains incarcerated at Dixon Correctional Center, where all alleged acts occurred. Plaintiff's submissions have also been reasonably coherent and clear for this stage in the litigation.  Finally, the Court grants *pro se* litigants wide latitude in the pursuit of their lawsuits.

Date:   May 16, 2017